HARTFORD PRINCIPALS' AND SUPERVISORS' ASSOCI-
ATION *v.* MARK R. SHEDD, COMMISSIONER OF
THE DEPARTMENT OF EDUCATION, ET AL.
(12697)

PETERS, C. J., HEALEY, SHEA, CALLAHAN and F. FREEDMAN, Js.

Argued December 9, 1986—decision released March 10, 1987

*William S. Zeman,* with whom was *Joel M. Ellis,* for the appellant (plaintiff).

*Laurie Adler,* assistant attorney general, with whom, on the brief, were *Joseph I. Lieberman,* attorney general, and *Robert W. Garvey,* assistant attorney general, for the appellee (named defendant).

*H. Maria Cone,* assistant corporation counsel, with whom, on the brief, were *Richard H. Goldstein,* corporation counsel, and *Anna V. Crawford,* legal intern, for the appellee (defendant city of Hartford).

*Patrice A. McCarthy* filed a brief for the Connecticut Association of Boards of Education as amicus curiae.

SHEA, J. The dispositive issue in this appeal is whether mediation and binding arbitration procedures under the Teacher Negotiation Act are available to resolve contractual disputes between a school board and an employees' union arising during the term of an existing contract. The plaintiff, Hartford Principals' and Supervisors' Association, unsuccessfully appealed to the Superior Court a declaratory ruling on two petitions it had filed with the commissioner of education in which the commissioner held that the mediation and arbitration provisions of the act apply only to the process of bargaining for a new contract. The plaintiff has filed a combined appeal from the judgments of the trial court affirming the ruling on each petition. We find no error.

The defendant Hartford Board of Education (board) and the plaintiff Hartford Principals' and Supervisors'

Association (union) entered into a collective bargaining agreement effective July 1, 1975, to June 30, 1978. During the term of the agreement, David Mulholland, a Hartford school principal, complained that the board had unilaterally assigned him additional duties on a long-term basis that modified his basic job responsibilities. The union sought to negotiate additional pay for Mulholland under article IV, § 12, of the collective bargaining agreement, which provided that "[w]henever the Superintendent or the Board of Education modifies the basic job responsibilities and duties of a unit position on a regular, long-term basis, in excess of 10 consecutive working days, the [union] shall have the right to negotiate and re-evaluate the grid placement of that position." The board declined this request. On August 15, 1978, the state board of labor relations termed the board's refusal to negotiate a breach of contract and ordered collective bargaining to begin immediately in accordance with the contract. The parties then negotiated for approximately one month without reaching agreement. Early in the term of the subsequent collective bargaining agreement in effect from July 1, 1978, to June 30, 1982, the same parties again engaged in mid-term bargaining without resolution concerning a list of nine matters that allegedly involved changes in the conditions of employment of school administrators.

In an attempt to resolve both bargaining impasses, the union, in October, 1979, and again in November, 1979, requested the defendant state department of education to begin the process of mediation and binding arbitration, invoking General Statutes § 10-153f[1] of the

---

[1] General Statutes § 10-153f provides in part: "(b) If any local or regional board of education cannot agree with the exclusive representatives of a teachers' or administrators' unit after negotiation concerning the terms and conditions of employment applicable to the employees in such unit, either party may submit the issues to the commissioner for mediation. On the one hundred tenth day prior to the budget submission date, the commissioner

Teacher Negotiation Act. General Statutes §§ 10-153a through 10-153n. A designee of the defendant commis-

shall order the parties to report their settlement. If, on such one hundred tenth day, the parties have not reached agreement and have failed to initiate mediation, the commissioner shall order the parties to notify the commissioner of the name of a mutually selected mediator and to commence mediation. . . .

"(c) (1) On the fourth day next following the end of the mediation session or on the eighty-fifth day prior to the budget submission date, whichever is sooner, the commissioner shall order the parties to report their settlement of the dispute or, if there is no settlement, to notify the commission of the name of the single arbitrator mutually selected by them or shall notify the commissioner of the name of the arbitrator selected by each of them. . . .

"(2) The chairperson of the arbitration panel or the single arbitrator shall set the date, time and place for a hearing to be held in the school district between the seventh and fifteenth day, inclusive, after such chairperson or such single arbitrator is designated. At least five days prior to such hearing, a written notice of the date, time and place of the hearing shall be sent to the board of education and the representative organization which are parties to the dispute, and, if a three-member arbitration panel is selected or designated, to the other members of such panel. Such written notice shall also be sent to the fiscal authority having budgetary responsibility or charged with making appropriations for the school district, and a representative designated by such body may be heard at the hearing as part of the presentation and participation of the board of education. . . .

"(3) The hearing may, at the discretion of the arbitration panel or the single arbitrator, be continued but in any event shall be concluded within twenty-five days after its commencement.

"(4) After hearing all the issues, the arbitrators or the single arbitrator shall, within twenty days, render a decision in writing, signed by a majority of the arbitrators or the single arbitrator, which states in detail the nature of the decision and the disposition of the issues by the arbitrators or the single arbitrator. The written decision shall include a narrative explaining the evaluation by the arbitrators or the single arbitrator of the evidence presented for each item upon which a decision was rendered by the arbitrators or the single arbitrator. . . . The decision of the arbitrators or the single arbitrator shall be final and binding upon the parties to the dispute. The decision of the arbitrators or the single arbitrator shall incorporate those items of agreement the parties have reached prior to its issuance. At any time prior to the issuance of a decision by the arbitrators or the single arbitrator, the parties may jointly file with the arbitrators or the single arbitrator, any stipulations setting forth contract provisions which both parties agree to accept. The factors to be considered by the arbitrators or the single arbitrator in arriving at a decision shall include: (A) The

sioner of education (commissioner) refused, asserting that the impasse resolution procedures available under § 10-153f do not apply to mid-term disputes. The union then filed for each mid-term dispute a petition for a declaratory ruling with the state department of education, seeking a contrary determination. Following the commissioner's declaratory ruling on both disputes that "midstream" negotiations are not within the purview of the mediation and arbitration provisions of § 10-153f, the union appealed the ruling in each instance separately to the Superior Court, which, on February 5, 1985, upheld both rulings. A combined appeal from the judgments was filed.

## I

## A

Before reaching the merits of the union's appeal from the judgments of the trial court, we note that the collective bargaining agreements under which both mid-term disputes arose have since expired and have been succeeded, in 1982 and again in 1985, by new contracts. Hence, we consider, at the outset, the threshold question of whether the present appeal is moot. See *Connecticut Foundry Co.* v. *International Ladies Garment Workers Union*, 177 Conn. 17, 19, 411 A.2d 1 (1979). "It is a well-settled general rule that the existence of an actual controversy is an essential requisite to appel-

negotiations between the parties prior to arbitration; (B) the public interest and the financial capability of the school district; (C) the interests and welfare of the employee group; (D) changes in the cost of living; (E) the existing conditions of employment of the employee group and those of similar groups and (F) the salaries, fringe benefits, and other conditions of employment prevailing in the state labor market. The parties shall submit to the arbitrators or the single arbitrator their respective positions on each individual issue in dispute between them in the form of a last best offer. The arbitrators or the single arbitrator shall resolve separately each individual disputed issue by accepting the last best offer thereon of either of the parties, and shall incorporate in a decision each such accepted individual last best offer. . . ."

late jurisdiction; it is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow. *Connecticut State Employees Assn.* v. *AFSCME,* 188 Conn. 196, 199, 448 A.2d 1341 (1982); *Waterbury Hospital* v. *Connecticut Health Care Associates,* 186 Conn. 247, 440 A.2d 310 (1982)." *State* v. *Macri,* 189 Conn. 568, 569, 456 A.2d 1203 (1983); see also *Shays* v. *Local Grievance Committee,* 197 Conn. 566, 571–74, 499 A.2d 1158 (1985). Although not raised by any party to this appeal, the issue of jurisdiction may be examined by this court on its own motion.[2] Practice Book § 3110 (now § 4056); *Kulmacz* v. *Kulmacz,* 177 Conn. 410, 412, 418 A.2d 76 (1979); *LaReau* v. *Reincke,* 158 Conn. 486, 494, 264 A.2d 576 (1969).

"The law recognizes that the actions of parties themselves, by settling their differences, can cause a case to become moot." *Waterbury Hospital* v. *Connecticut Health Care Associates,* supra, 251. "The duty of this court, as of every other judicial tribunal, is to decide actual controversies by a judgment which can be carried into effect . . . . It necessarily follows that when, pending an appeal from the judgment of a lower court, and without any fault of the defendant, an event occurs which renders it impossible for this court . . . to grant [the plaintiff] any effectual relief whatever, the court

---

[2] Although not raised in this appeal, the issue of mootness was litigated in the trial court upon the defendants' motions to dismiss. The defendants contended that because the union had the right but failed to negotiate and arbitrate during new contract negotiations both the disputes that remained unresolved as well as a clause allowing midstream arbitration, it had waived its claims, effectively rendering its appeal from the commissioner's declaratory ruling moot. The trial court, *Hammer, J.,* denied the defendants' motions, stating: "It is only where there is no possibility that a party has suffered or will suffer injury from the ruling which is the subject of his appeal that the court should not entertain it." See *Waterbury Trust Co.* v. *Porter,* 130 Conn. 494, 499, 35 A.2d 837 (1944).

will not proceed to a formal judgment, but will dismiss the appeal." *Mills* v. *Green,* 159 U.S. 651, 653, 16 S. Ct. 132, 40 L. Ed. 293 (1895); see *Kulmacz* v. *Kulmacz,* supra; *Waterbury Trust Co.* v. *Porter,* 130 Conn. 494, 498, 35 A.2d 837 (1944); cf. D. Kates & W. Barker, "Mootness in Judicial Proceedings: Toward a Coherent Theory," 62 Calif. L. Rev. 1385, 1403 (1974).

It might have been possible for the union to seek a resolution of its claim for mid-term dispute negotiations by seeking a provision specifically allowing negotiation and ultimate arbitration of mid-term disputes in contracts following those that have expired under which the disputes presently involved have arisen. We were assured at oral argument however that no such provision has been included in successor contracts. The failure of a party to pursue alternative means of dispute resolution does not render moot the issues raised in a legal action, though it may be of concern in deciding whether he is entitled to pursue that action. In any event, the issue of the construction of General Statutes § 10-153f, under which the union claims a statutory right to mediation and arbitration of mid-term disputes, would not have been resolved during such bargaining.

We conclude that even if we were to regard the viability of the present claim as having been affected by the expiration of the collective bargaining agreement, this case presents a situation "capable of repetition, yet evading review." See *Waterbury Hospital* v. *Connecticut Health Care Associates,* supra, 253; *Delevieleuse* v. *Manson,* 184 Conn. 434, 437, 439 A.2d 1055 (1981). In *Weinstein* v. *Bradford,* 423 U.S. 147, 149, 96 S. Ct. 347, 46 L. Ed. 2d 350 (1975), the United States Supreme Court, citing its review of the historical development of the mootness doctrine in *Sosna* v. *Iowa,* 419 U.S. 393, 397–403, 95 S. Ct. 553, 42 L. Ed. 2d 532 (1975), concluded that "in the absence of a class

action, the 'capable of repetition, yet evading review' doctrine was limited to the situation where two elements combined: (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was reasonable expectation that the same complaining party would be subjected to the same action again." See *Connecticut Foundry Co.* v. *International Ladies Garment Workers Union,* supra, 20–21.

The present case satisfies both elements. That mid-term disputes between the union and the board are likely to arise again is not an unreasonable assumption. See, e.g., L. Bingham, "Mid-Term Bargaining Disputes and Binding Interest Arbitration For Public Sector Employees," 17 Conn. L. Rev. 365, 366 n.7 (1985); but cf. *Connecticut State Employees Assn.* v. *AFSCME,* supra, 200–201; *Waterbury Hospital* v. *Connecticut Health Care Associates,* supra, 253–55. A bargaining agreement of the usual two or three year duration would probably expire before any claims engendered by such mid-term disputes had been fully litigated. Because the question before this court is therefore not "purely academic"; *Delevieleuse* v. *Manson,* supra, 436; *Connecticut Foundry Co.* v. *International Ladies Garment Workers Union,* supra, 19; we decline to dismiss the present appeal because of mootness.

### B

A further issue that we similarly consider sua sponte; Practice Book § 3110 (now § 4056); is whether the union's failure to exhaust available remedies under the grievance procedures of the collective bargaining agreement deprives us of jurisdiction over the subject matter. See *School Administrators Assn.* v. *Dow,* 200 Conn. 376, 382–83, 511 A.2d 1012 (1986); *Cislo* v. *Shelton,* 35 Conn. Sup. 645, 650, 405 A.2d 84 (1978). The agreement between the board and the union provided, in arti-

cle V, § C, that "[i]n the event a grievance involving the application or interpretation of the specific provisions of this Agreement shall not have been settled . . . the [union] may submit such grievance to the American Arbitration Association for arbitration." It is arguable, therefore, that the union should more properly have submitted its mid-term disputes to the contractually permitted grievance procedure.

We recently adopted the federal rule that " 'the employee must at least attempt to exhaust exclusive grievance and arbitration procedures established by the bargaining agreement' before resorting to the courts." *School Administrators Assn.* v. *Dow,* supra, 381, quoting *Vaca* v. *Sipes,* 386 U.S. 171, 184, 87 S. Ct. 903, 17 L. Ed. 2d 842 (1967); *Republic Steel Corporation* v. *Maddox,* 379 U.S. 650, 652, 85 S. Ct. 614, 13 L. Ed. 2d 580 (1965). We observed that the general assembly in enacting the Teacher Negotiation Act "clearly intended that it is 'not only permissible but desirable' for grievances between employees . . . and the employer . . . to be settled through contract grievance-arbitration procedures." *School Administrators Assn.* v. *Dow,* supra. While adhering to this reasoning, we nevertheless decline to dismiss this appeal for lack of subject matter jurisdiction.

In *School Administrators Assn.* v. *Dow,* supra, 382, the plaintiffs sought to enjoin the defendant officials from discharging certain school administrators, alleging that the defendants had acted unfairly, and had violated the bargaining agreement, state statutory procedures and certain of the plaintiffs' constitutional rights. We noted that "the complaint is not unlike those usually brought for employee grievances and essentially seeks relief for harms occurring in the context of an employer-employee relationship. See *Cahill* v. *Board of Education,* 198 Conn. 229, 236–39, 502 A.2d 410 (1985). Given the broad wording of the grievance pro-

visions of the collective bargaining agreement, we have no doubt that the relief requested in this case is within the scope of the contractual remedies available." *School Administrators Assn.* v. *Dow,* supra, 382–83. The action in the present case, by contrast, is a petition for a declaratory ruling interpreting a state statute and seeks no relief for individual members of the union.

We said in *School Administrators Assn.* v. *Dow,* supra, 383 n.5, that "[t]he plaintiffs' action could be maintained if the agreement did not make the grievance-arbitration process the exclusive remedy for the parties. *Republic Steel Corporation* v. *Maddox,* [supra, 657–58]." As stated above, grievances under the parties' contract in the present case were arbitrable when they involved "the application or interpretation of the specific provisions of this Agreement . . . ." The agreement defined "grievance," however, in article V, § 1, to mean not only a complaint that "there is a misinterpretation or misapplication of the specific provisions of the manual or of this Agreement," but also a complaint "by an employee that he/she has been subjected to arbitrary, capricious or discriminatory policy or practice or that his/her rights under the specific language of the manual or this Agreement have been violated." If mediation and arbitration under the act were available to the union as a method of resolving the mid-term disputes that have arisen, the union would be entitled to pursue issues beyond those involving interpretation of the contract language or relating to claims that an employee has been subjected to some "arbitrary, capricious or discriminatory policy or practice," thus falling within the definition of "grievance." Although the dispute involving Mulholland that arose under the 1975-1978 contract may well qualify as a grievance, as it appears to involve primarily issues of contract interpretation, the remaining disputes under the 1978-1982 contract cannot readily be classified as

"grievances" within the contract definition on the basis of the record available to us. We conclude that the union is not barred from pursuing this action because it has failed to resort to the contract grievance procedure.

## II

We now turn to the merits of the union's claim that the trial court, *Corrigan, J.*, erred in dismissing its appeal from the declaratory ruling by the commissioner that mid-term disputes were not covered by the mediation and arbitration provisions of General Statutes § 10-153f of the Teacher Negotiation Act. The union contends that because " 'arbitration of labor disputes under collective bargaining agreements is part and parcel of the collective bargaining process itself' "; *Policemen's & Firemen's Retirement Board* v. *Sullivan,* 173 Conn. 1, 9, 376 A.2d 399 (1977), quoting *United Steelworkers of America* v. *Warrior & Gulf Navigation Co.,* 363 U.S. 574, 578, 80 S. Ct. 1347, 4 L. Ed. 2d 1409 (1960); the duty to negotiate as defined by General Statutes § 10-153e (d) includes the duty to arbitrate. We are not persuaded by this argument.

The fallacy underlying the union's position is the assumption that the "duty to negotiate with respect to salaries and other conditions of employment" imposed by § 10-153d (b) is an equivalent to the duty "to negotiate in good faith," which is broadly defined in § 10-153e (d). The former is the avenue to the ultimate resolution of unsettled differences concerning a new collective bargaining agreement by binding arbitration pursuant to § 10-153f, while the latter describes the duty "to negotiate in good faith," the breach of which is a prohibited practice under § 10-153e (b) and (c) but does not trigger arbitration.

Section 10-153e (d) defines the term "to negotiate in good faith" as "the performance of the mutual obligation of the board of education or its representatives or

agents and the organization designated or elected as the exclusive representative for the appropriate unit to meet at reasonable times, including meetings appropriately related to the budget-making process, and to participate actively so as to indicate a present intention to reach agreement with respect to salaries and other conditions of employment, or the negotiation of an agreement, or any question arising thereunder . . . . " The Teacher Negotiation Act "is essentially patterned on the National Labor Relations Act so that federal judicial interpretations of the federal act are of great assistance and persuasive force in the interpretations of it. *West Hartford Education Assn., Inc.* v. *DeCourcy,* 162 Conn. 566, 578–79, 295 A.2d 526 (1972)." *Board of Education* v. *Connecticut State Board of Labor Relations,* 190 Conn. 235, 241, 460 A.2d 1255 (1983). The United States Supreme Court has asserted that under the federal act "the duty to bargain unquestionably extends beyond the period of contract negotiations and applies to labor-management relations during the term of an agreement." *NLRB* v. *Acme Industrial Co.,* 385 U.S. 432, 436, 87 S. Ct. 565, 17 L. Ed. 2d 495 (1967). The definition of the duty "to negotiate in good faith" contained in § 10-153e (d), which obligates the parties to negotiate on the subject of not only a new collective bargaining agreement but also "any question arising thereunder," the very phrase in the federal act upon which the United States Supreme Court focused in *Acme;* see 29 U.S.C. § 158 (d); warrants a similar interpretation where that definition is applicable.

The duty to negotiate mid-term disputes with the attendant consequence of binding arbitration pursuant to § 10-153f, however, is another matter. It would be inconsistent with the provision of § 10-153e (d) that the obligation to negotiate in good faith "shall not compel either party to agree to a proposal or require the mak-

ing of a concession" to hold that the duty to negotiate under § 10-153d (b), which entails the consequence of compulsory arbitration if no contract settlement is reached, is congruent with the definition of good faith negotiation in § 10-153e (d). Section 10-153e (d) expressly restricts the application of its definition of "to negotiate in good faith" to "this section, sections 10-153a to 10-153c, inclusive, and section 10-153g . . . ." The sections of the Teacher Negotiation Act that deal with mediation and binding arbitration, §§ 10-153d and 10-153f, are excluded from the purview of § 10-153e (d) and do not refer to a duty "to negotiate in good faith." Rather, § 10-153d (b) states that the board and the union "shall have the duty to negotiate with respect to salaries and other conditions of employment about which either party wishes to negotiate." Language that would suggest a duty to negotiate a mid-term "question arising thereunder" is conspicuously absent from § 10-153d. "The meaning to be given a statute is determined by legislative intent and that legislative intent must be determined by language actually used in the legislation. *Knoll* v. *Kelley,* 142 Conn. 592, [596], 115 A.2d 678 [1955]." *Eason* v. *Welfare Commissioner,* 171 Conn. 630, 634, 370 A.2d 1082 (1976), cert. denied, 432 U.S. 907, 97 S. Ct. 2953, 53 L. Ed. 2d 1079 (1977). Thus, the subject matter of the negotiations mandated by § 10-153d, which prescribes arbitration if the legislative body of the local or regional school district rejects the contract resulting from such negotiations; General Statutes § 10-153d (b) and (c); does not expressly include mid-term disputes.

Section 10-153f sets forth the mechanics of the mediation and arbitration procedures under the Teacher Negotiation Act. It provides a timetable based entirely on the municipality's budget submission date. Negotiations over-salaries and other conditions of employment must begin "not less than one hundred eighty days

prior to the budget submission date." General Statutes § 10-153d (b). If the parties have been unable to reach an agreement, they must initiate mediation at least 110 days prior to that date. General Statutes § 10-153f (b). On the fourth day following the end of mediation, or on the eighty-fifth day before the budget submission date, whichever is sooner, the parties must either report their settlement to the commissioner or enter binding arbitration. General Statutes § 10-153f (c) (1); see General Statutes § 10-153f (c) (4). Further, a written notice of the date, time and place of the arbitration hearing must be sent by the arbitration panel not only to the parties, but also "to the fiscal authority having budgetary responsibility or charged with making appropriations for the school district." General Statutes § 10-153f (c) (2).

The plaintiff argues that the legislature designed a timetable for mediation and arbitration merely "to secure order, system and dispatch in [the] proceedings . . . ." "Legislative provisions designed to secure order, system and dispatch in proceedings are ordinarily held to be directory where, as here, they are stated in affirmative terms or, to express it differently, are unaccompanied by negative words." *Winslow* v. *Zoning Board,* 143 Conn. 381, 388, 122 A.2d 789 (1956). "Such a statutory provision is one which prescribes what shall be done but does not invalidate action upon a failure to comply." *Broadriver, Inc.* v. *Stamford,* 158 Conn. 522, 529, 265 A.2d 75 (1969), cert. denied, 398 U.S. 938, 90 S. Ct. 1841, 26 L. Ed. 2d 270 (1970).

We agree with the defendants' response that if the time limits in the act were intended solely to move the dispute resolution process along, there would be no need to refer to the budget submission date. The legislature could simply have provided that failed negotiations would be followed within a specified period by mediation, and similarly that arbitration would have

to begin within a certain time frame thereafter. If we were to adopt the union's interpretation, we would be compelled to impute to the legislature the needless step of incorporating a meaningless phrase, "the budget submission date." "This we cannot do. No word in a statute should be treated as superfluous, void or insignificant unless there are impelling reasons, not here discernible, why this principle cannot be followed." *General Motors Corporation* v. *Mulquin,* 134 Conn. 118, 126, 55 A.2d 732 (1947). A reasonable interpretation of § 10-153f that accounts for the significance of linking the mediation and arbitration of disputes to the budget submission date is that such disputes are intended to be limited to those naturally arising around the time of budget submission such as those pertaining to new collective bargaining agreements.

Section 10-153f (b) states that if, on the 110th day prior to the budget submission date, "the parties have not reached agreement and have failed to initiate mediation, the commissioner *shall* order the parties . . . to commence mediation." (Emphasis added.) Subsection (c) (1) of § 10-153f continues that in the event no settlement is reached through mediation, the commissioner "shall" order the parties to designate an arbitrator within four days or on the eighty-fifth day prior to the budget submission date, whichever is sooner. This use of the word "shall," "considered in conjunction with the use of the word 'may' in other sentences of the same statutory section, supports the conclusion that the legislature acted with complete awareness of their different meanings. *Jones* v. *Civil Service Commission,* 175 Conn. 504, 509, 400 A.2d 721 (1978)." *Zoning Board of Appeals* v. *Freedom of Information Commission,* 198 Conn. 498, 505, 503 A.2d 1161 (1986). "Although the use of the word 'shall' does not invariably create a mandatory duty, because statutes must be construed as a whole to ascertain the legislative

intention"; id., 505–506; we are persuaded that the time requirements of § 10-153f, linked to the budget submission date, went to the essence of that provision's purpose and were intended to be mandatory. See *Zoning Board of Appeals* v. *Freedom of Information Commission,* supra, 503–504; *Gallup* v. *Smith,* 59 Conn. 354, 358, 22 A. 334 (1890). The Teacher Negotiation Act thus provides mediation and binding arbitration only in accordance with mandatory time sequences related to the budget submission date. We conclude that our legislature did not intend mid-term disputes to be within the purview of such impasse resolution procedures.

The legislative history of the act buttresses our conclusion. In the debate over No. 76-403 of the 1976 Public Acts, the Connecticut Education Association advocated the adoption of binding arbitration provisions; see Conn. Joint Standing Committee Hearings, Education, Pt. 3, 1976 Sess., pp. 696–705, statement of Thomas Mondani, Executive Director, Connecticut Education Association; but at no point suggested that the proposed procedures would apply to disputes other than those involving new contracts. The amended bill that passed in both houses of the General Assembly provided for mediation and advisory arbitration only. Representative Howard Klebanoff explained the amended bill thus: "The bill does not provide final offer binding arbitration. It does define such things as budget submission day, and it does provide, therefore, various time tables for the parties to come together to try to arrive at a contract both for mediation and arbitration. Another thing it does is it requires, for example, members of the Boards of Education to meet and confer with the fiscal authority of their town before negotiations begin to develop an understanding of the town's fiscal situation." 19 H.R. Proc., Pt. 8, 1976 Sess., pp. 3205–3206; see generally P. Adomeit, "The 1976 Amendments to the Act Governing Collective Bargain-

ing Between Teacher Organizations and Boards of Education in Connecticut: An Appraisal," 9 Conn. L. Rev. 545, 558–62 (1977).

Number 79-405 of the 1979 Public Acts incorporated "last best offer interest arbitration"[3] into the act. One commentator noted that "all testimony was limited to the problem of impasse in contract negotiations . . . . The clear intent of the legislature was to give teachers binding arbitration in lieu of the right to strike . . . . [N]either proponents nor opponents ever suggested that these impasse resolution procedures would be available to resolve a dispute that did not concern the negotiation of a full collective bargaining agreement." L. Bingham, "Mid-term Bargaining Disputes and Binding Interest Arbitration for Public Sector Employees," 17 Conn. L. Rev. 365, 372–76 (1985). For example, Senator Lawrence DeNardis, referring to teachers, stated that the proposed bill "evens their hand with respect to this important process that occurs once every year or once every two or three years." 22 S. Proc., Pt. 8, 1979 Sess., p. 2732.

The mediation and arbitration procedure provided in § 10-153f applies only when any local or regional board of education "cannot agree with the exclusive representatives of a teachers' or administrators' unit after negotiation concerning the terms and conditions of employment applicable to the employees in such unit." General Statutes § 10-153f (b). In *West Hartford Edu-*

---

[3] "In last best offer interest arbitration, parties to a dispute submit their proposals as contract language and present evidence of past practice, comparability with surrounding towns, the cost of living, and the employer's ability to pay for proposed wage and benefits improvements. A single arbitrator or a tripartite panel then decides which party's proposal will become part of the contract. The arbitrator's decision is final. Appeal is available only on very narrow grounds." L. Bingham, "Mid-term Bargaining Disputes and Binding Interest Arbitration for Public Sector Employees," 17 Conn. L. Rev. 365, 366 n.11 (1985).

*cation Assn., Inc.* v. *DeCourcy,* supra, 587, this court interpreted the identical language of General Statutes (Rev. to 1972) § 10-153f as concerning "the making of a contract between the board of education and the teachers' organization . . . ." In the present case, the commissioner relied in part on this dictum from our decision in *DeCourcy* in his declaratory ruling that the arbitration procedure prescribed by § 10-153f "is limited to negotiations of contracts." This is not an appropriate case for applying an exception to the well established principle that courts should "accord great deference to the construction given the statute by the agency charged with its enforcement." *Corey* v. *Avco-Lycoming Division,* 163 Conn. 309, 326, 307 A.2d 155 (1972) (*Loiselle, J.,* concurring), cert. denied, 409 U.S. 1116, 93 S. Ct. 903, 34 L. Ed. 2d 699 (1973); *Board of Education* v. *Connecticut State Board of Labor Relations,* 190 Conn. 235, 241, 460 A.2d 1255 (1983). The trial court was correct in dismissing the plaintiff's appeal from the declaratory ruling of the commissioner of education.

There is no error.

In this opinion the other justices concurred.