## TOWN OF WESTPORT *v.* STATE OF CONNECTICUT ET AL.
## (13078)

PETERS, C. J., HEALEY, SHEA, CALLAHAN and LAVERY, Js.

Argued May 13—decision released June 30, 1987

*Richard L. Albrecht,* with whom was *Stewart I. Edelstein,* for the appellant (plaintiff).

*Cornelius F. Tuohy,* assistant attorney general, with whom, on the brief, was *Joseph I. Lieberman,* attorney general, for the appellees (defendants).

PETERS, C. J. The determinative issue on this appeal is whether the state justifiably relied upon the existence of an emergency when it constructed a temporary truck weighing and inspection station without first undertaking an environmental impact evaluation. The plaintiff, the town of Westport, filed a complaint seeking injunctive and declaratory relief from the defendants.[1] As grounds for this relief, the plaintiff claimed that the construction and operation of a temporary weighing station between Exits 17 and 18 on Interstate Highway 95 in Westport violated the Environmental Policy Act, General Statutes §§ 22a-1 through 22a-13, and the Environmental Protection Act, General Statutes §§ 22a-14 through 22a-20. The trial court, after an extensive hearing, rendered judgment for the defendants. The trial court found that the plaintiff could not prevail under the Environmental Protection Act, and that the defendants' noncompliance with the Environmental Policy Act was justified by that act's express exemption for emergency measures. General Statutes

---

[1] The defendants are: the state of Connecticut; William A. O'Neill, the governor of the state of Connecticut; J. William Burns, the transportation commissioner of the state of Connecticut; the cities of Norwalk and Stamford; and the towns of Darien and Greenwich. The last four defendants were joined in the complaint because the plaintiff alleged, they "have a substantial interest" in the outcome of the litigation "by virtue of their consideration as alternate sites" for the weighing station.

§ 22a-1c.[2] The plaintiff sought and received permission for a direct appeal to this court pursuant to General Statutes § 52-265a. We find no error.

The trial court's memorandum of decision establishes the following facts. Interstate Highway 95, now known as the Governor John Davis Lodge Turnpike, was opened in the Westport area in 1957. The turnpike was operated as a toll road until October, 1985. Removal of the toll stations resulted in a 20 percent increase in traffic and a marked increase in accidents.

Governor William A. O'Neill, on August 22, 1986, declared a state of emergency on Connecticut's highways. Among the measures he then announced was the establishment of a temporary truck weighing and inspection station on the turnpike in Westport. Four days later, the deputy commissioner of transportation, relying on General Statutes § 13b-26 (f),[3] declared the

[2] "[General Statutes] Sec. 22a-1c. ACTIONS AFFECTING ENVIRONMENT DEFINED. Actions which may significantly affect the environment are defined for the purposes of section 22a-1b as individual activities or a sequence of planned activities proposed to be undertaken by state departments, institutions or agencies, or funded in whole or in part by the state, which could have a major impact on the state's land, water, air, historic structures and landmarks as defined in section 10-321a, or other environmental resources, or could serve short term to the disadvantage of long term environmental goals. For the purposes of section 22a-1b, actions shall include but not be limited to new projects and programs of state agencies and new projects supported by state contracts and grants, but shall not include (1) emergency measures undertaken in response to an immediate threat to public health or safety; or (2) activities in which state agency participation is ministerial in nature, involving no exercise of discretion on the part of the state department, institution or agency."

[3] General Statutes § 13b-26 (f) provides: "(1) Whenever a state of emergency, as a result of a disaster, exists in the state or any part of the state, and is so declared to be under the provisions of any federal law or state statute, and the state highway system becomes damaged as a result of such disaster, or (2) whenever the commissioner declares that an emergency condition exists on any highway in the state which demands immediate attention to insure the safety of the traveling public, whether or not such highway is damaged, the commissioner may, notwithstanding any other provision of the statutes, employ, in any manner, such assistance as he may require

existence of an "emergency condition." His emergency declaration ordered the construction of a weighing and inspection station at a designated site in Westport that had formerly been a rest area but had been entirely closed to the public in recent years.[4]

The Westport station is used for weighing and inspection purposes by having state inspectors flag over many but not all trucks using the highway. Those trucks that do not pass inspection may be "deadlined" at the rear of the parking lot at Sherwood Island State Park. Those that are found to be leaking either cargo or fuel may be required to discharge such fluids either over a sand pile or over a containment tank. The containment site, weighing station and inspection area are located less than 200 feet from the Sherwood Mill Pond, which is a prime coastal estuary. The "deadline" site is located adjacent to prime tidal wetlands.

The trial court expressly recognized that contamination by hazardous materials from the station site could jeopardize the environmental integrity of the pond, the

to restore said highway system to a condition which will provide safe travel or to correct the emergency condition so declared by the commissioner. Any declaration issued pursuant to this subdivision may be disapproved within twenty-four hours of the issuance of such declaration by a majority vote of the transportation accountability board established pursuant to section 13b-79m. Any such disapproval shall become effective upon filing by the board of notice of such disapproval with the office of the secretary of the state."

[4] The deputy commissioner's emergency declaration provided in relevant part: "Pursuant to Governor William A. O'Neill's declaration on Friday, August 22, 1986 that due to the numerous fatal accidents in recent months, a state of emergency exists on Connecticut highways [, the] Governor has directed that a series of steps are to be taken to improve highway safety and specifically to reduce truck related accidents.

"Actions to be taken by this Department to achieve this goal include, but are not limited to, the installation of signing and the construction of a temporary truck weighing station on I-95 in the Town of Westport.

"Therefore, I am approving the employment of such assistance as may be required to expedite this work and restore the highways of the State of Connecticut to a safe condition."

estuaries and the wetlands. Based on experience, however, it is likely that, on average, less than one truck a month will be found to leak upon inspection at the Westport station. Few leaking trucks were discovered either during the initial inspections conducted at the Westport station or during earlier analogous inspections at a Mianus River Bridge station.[5]

On the basis of these factual findings, the trial court ruled that the plaintiff had standing to pursue its claims under both the Environmental Policy Act and the Environmental Protection Act, and that its action was not barred by laches. The court also determined that these statutes applied to the construction of the Westport weighing and inspection station. On the merits of the plaintiff's claims, the court concluded that the plaintiff could not prevail under the Environmental Protection Act because it had failed to prove "any present reasonable expectation of unreasonable pollution." With respect to the Environmental Policy Act, however, the court determined that, because the project could "arguably damage the environment," the state had failed to comply with that act's requirement for preparation of an environmental impact assessment.[6]

---

[5] The trial court found: "Trucks carrying toxic chemicals in both solid and liquid form regularly use Connecticut roads and highways. The internal combustion engines in those trucks are fueled by various hydrocarbon liquids. Both said chemicals and said liquids occasionally spill or leak onto our roads and highways. The cargo may be in a tank or in barrels or drums. The court must infer that in some manner some, if not all, of the liquids and chemicals leaked and spilled is released into the atmosphere or washed into our streams, rivers, ponds, lakes, swamps and, possibly, aquifers. This is so without this station, its sand pile and its containment tank. To reduce the risk of such spills and leaks the station has been constructed and is being operated. The operation of this station will not increase the number or severity of leaks and spills."

[6] In the nomenclature of environmental law, the department of transportation should have prepared, in advance of construction, either an environmental impact evaluation (EIE) or a finding of no significant impact (FONSI). See General Statutes § 22a-1b. The trial court used the term EIS, environmental impact statement, synonymously with the term EIE.

Nonetheless, the court ultimately rendered judgment for the defendants under the Environmental Policy Act on the ground that the state's failure to prepare an environmental impact statement was excused because of the statutory exception, in § 22a-1c, for "emergency measures . . . undertaken in response to an immediate threat to public health or safety."

In this court, controversy has been limited to the scope and the applicability of the Environmental Policy Act. With regard to that act, the defendants challenge the trial court's conclusion that, but for the existence of an emergency, the department of transportation would have been required to undertake an environmental impact study before constructing the Westport weighing and inspection station. They claim that the trial court erred in applying the act retroactively to a site that antedated the effective date of the act, and in requiring an environmental assessment in the absence of a showing that departmental action would "significantly" affect the environment. General Statutes § 22a-1b (b). The plaintiff contends, on the other hand, that the trial court erred in its construction and application of the emergency exception contained in § 22a-1c. Finally, in a motion filed after the parties submitted their briefs, the defendants urge us to dismiss the plaintiff's appeal as moot because environmental impact evaluations have now been prepared for the Westport station, and elsewhere, in anticipation of finding a permanent location for a weighing and inspection station near the western terminus of Interstate Highway 95.

I

Because mootness is jurisdictional, this court having no authority to deliver advisory opinions, we must first address the question raised by the defendants' motion to dismiss. *State* v. *Hope,* 203 Conn. 420, 423–24, 524

A.2d 1148 (1987); *Hartford Principals' & Supervisors' Assn.* v. *Shedd,* 202 Conn. 492, 496–98, 522 A.2d 264 (1987); *Shays* v. *Local Grievance Committee,* 197 Conn. 566, 571–74, 499 A.2d 1158 (1985). In their motion, the defendants allege that a detailed written environmental impact evaluation has now been prepared for the Westport weighing station, and that the public, including the plaintiff, has been notified of its availability.

As the plaintiff notes, however, the process of environmental assessment requires more than the publication of an environmental impact evaluation. Under the Environmental Policy Act, an agency's environmental evaluation must be reviewed and approved by the state office of policy and management, which has the authority, if necessary, to require whatever revisions are needed to satisfy existing statutory and regulatory requirements. General Statutes §§ 22a-1b through 22a-1e. Since the process of environmental evaluation has not yet been completed, the plaintiff's appeal is not moot.

## II

The defendants urge us to affirm the judgment of the trial court by a different route than that taken by that court. The defendants argue that no environmental assessments of any kind were required in this case for two reasons: (1) the provisions of the Environmental Policy Act do not govern the "reactivation" of the Westport weighing station; and (2) the act, in § 22a-1b (b), requires environmental impact assessments only for departmental actions "which may significantly affect the environment." We are unpersuaded that either of these reasons justifies the failure to obtain an environmental assessment.

The defendants raised the retroactivity argument in the trial court, where they maintained that the Westport weighing station was planned, designed and con-

structed long before the effective date of the Environmental Policy Act. The trial court took no issue with the principle of law upon which the defendants rely, namely that statutes are presumed to operate prospectively. *Enfield Savings & Loan Assn.* v. *Bissell,* 184 Conn. 569, 571, 440 A.2d 220 (1981); *East Village Associates, Inc.* v. *Monroe,* 173 Conn. 328, 331–32, 377 A.2d 1092 (1977); see General Statutes § 55-3. Instead, the court found, as a matter of fact, that "the construction and operation of a truck inspection station [is] substantially different from the rest area and intermittent inspection of the station previously in use." Specifically, the court found that the site had at one time been a highway rest area, and had been used intermittently as a weighing station employing temporary mobile scales. In recent years it had been entirely closed to traffic. In constructing the weighing station, the department of transportation had laid new asphalt and installed barriers, guardrails, a shelter, and lights. A weighing scale had been embedded in a pit. Water catch-basins and connecting pipes had been relocated, and a large concrete epoxy lined containment tank had been added to the station area.

Since the defendants have not challenged the validity of any of these findings of fact, the only question that remains is whether the Environmental Policy Act governs substantially new construction on property that the state has owned and used for many years. The case cited by the defendants, *National Wildlife Federation* v. *Goldschmidt,* 504 F. Sup. 314, 317 (D. Conn. 1980), aff'd, 677 F.2d 259 (2d Cir. 1982), does not address this question, because it deals with a project already under construction when the national Environmental Protection Act became effective. Absent compelling authority to the contrary, and recognizing the vital remedial purposes served by the Environmental Policy Act, we conclude, as did the trial court, that the

act applies to all new construction undertaken after its effective date. See also Regs., Conn. State Agencies § 22a-1a-1 (2).[7]

The defendants maintain, in the alternative, that the trial court should have found the construction of the Westport weighing station to be exempt from the requirements of the Environmental Protection Act because the plaintiff failed to prove that the actions of the department of transportation would "significantly affect the environment." General Statutes § 22a-1b. As the trial court correctly noted, this argument is foreclosed by our decision in *Manchester Environmental Coalition* v. *Stockton,* 184 Conn. 51, 63, 441 A.2d 68 (1981). In that case, we construed § 22a-1b to require an environmental impact assessment "whenever [a] project will *arguably* damage the environment." (Emphasis added.) Id., 67. The trial court concluded that the plaintiff at trial had produced sufficient evidence "that, if presented to [the department of transportation], should have caused [the department] to begin the process of deciding if an EIS or FONSI was necessary." We emphasize again, as we did in *Manchester Environmental Coalition* v. *Stockton,* that the purpose of the Environmental Policy Act is to ensure systematic consideration of environmental risks at the early stages of planning *before* the state commits its resources to the particular use of a site. Id., 68; Regs., Conn. State Agencies § 22a-1a-7 (b);[8] see also *National*

---

[7] The regulations of Connecticut state agencies, § 22a-1a-1 (2) provides: "Action means an individual activity or a sequence of planned activities initiated or proposed to be undertaken by an agency or agencies, or funded in whole or in part by the state. Actions include, but are not limited to, capital improvements, alterations, repairs, or additions to the real property of the state; acquisition of real property for the purpose of capital improvements; lease/purchase agreements; grants-in-aid or financial assistance for housing, business, industry, restoration or demonstration projects; or other proposed activity for which an agency exercises judgment or discretion as to the propriety of that action."

[8] The regulations of Connecticut state agencies, § 22a-1a-7 (b) provides: "An environmental impact evaluation shall be prepared as close as possi-

*Audubon Society* v. *Hester,* 801 F.2d 405, 407–408 (D.C. Cir. 1986); *Calvert Cliffs' Coordinating Committee* v. *United States Atomic Energy Commission,* 449 F.2d 1109, 1113–15 (D.C. Cir. 1971). As the trial court held, the department's failure to undertake such planning in this case violated the act unless its conduct fell within one of the act's specific statutory exemptions.

## III

The plaintiff contends, in its appeal, that the trial court erred in its interpretation of the statutory exemption for "emergency measures undertaken in response to an immediate threat to public health or safety." General Statutes § 22a-1c. We will treat jointly the plaintiff's two arguments addressed to the scope of such an exemption as a matter of law, and then consider its other two arguments about the applicability of the exemption to the facts of this case.

As a matter of law, the plaintiff urges us to construe the emergency exemption in light of the remedial policy of the Environmental Policy Act. That policy requires public agencies to undertake programmatic pursuit of environmental assessments of their actions so as to "conserve, improve and protect [Connecticut's] natural resources and environment and to control air, land and water pollution in order to enhance the health, safety and welfare of the people of the state." General Statutes § 22a-1. The purpose of the act is to have environmental assessments *precede* agency action. General Statutes § 22a-1b (b).

---

ble to the time an agency proposes an action. The evaluation shall be prepared early enough so that it can practically serve as an important contribution to the decision-making process and shall not be used to rationalize or justify decisions already made. Preparation of an environmental impact evaluation shall not prevent an agency from conducting contemporaneous engineering, economic, feasibility and other studies which do not otherwise commit the agency to commence or engage in such action or limit the choice of reasonable alternatives."

In order to implement the policy and the purpose of the Environmental Policy Act, it is appropriate to construe its exemptions narrowly and to impose the burden of proving the applicability of an exemption upon the agency claiming its benefit. *Conservation Commission* v. *Price,* 193 Conn. 414, 423–24, 479 A.2d 187 (1984); *Wilson* v. *Freedom of Information Commission,* 181 Conn. 324, 329, 435 A.2d 353 (1980); *State* v. *Avcollie,* 174 Conn. 100, 109–10, 384 A.2d 315 (1977). Nonetheless, we disagree with the plaintiff that the failure of the department of transportation to initiate an environmental assessment before the commencement of work at the Westport site automatically and totally deprives the defendants of the right to invoke the emergency exemption. Even narrowly construed, the emergency exemption must have some scope of operation. The legislature could reasonably have concluded that conditions of emergency would require an immediate governmental response that could not await the preplanning that the Environmental Policy Act normally envisages.

We turn then to the question of the applicability of the emergency exemption in the circumstances of this case. In that regard, the plaintiff has launched a twofold challenge to the rulings of the trial court, claiming that (1) the department of transportation's declaration of emergency was improper, and (2) the evidence did not establish an immediate threat to health or safety. The trial court determined that the construction of the temporary Westport station was an "emergency measure" under § 22a-1c because this project was specifically authorized by the declaration of emergency issued by the deputy commissioner of transportation on August 26, 1986. The commissioner of transportation is authorized to declare the existence of an "emergency condition" under General Statutes § 13b-26 (f) and had previously delegated to his deputy the authority to sign

any instrument which the commissioner was himself authorized to sign.

The plaintiff maintains that the trial court was in error in ruling that § 13b-26 (f) authorized the declaration of an emergency in this case. The statute confers such authority upon the commissioner of transportation in the event of "an emergency condition . . . which demands immediate attention to insure the safety of the traveling public . . . ." The increase of traffic because of the removal of tolls does not, according to the plaintiff, fall within the intended scope of "emergency condition." The trial court found, however, that, in the year between the closing of the toll stations and the time of trial, traffic on Interstate Highway 95 had increased by "a factor of at least 20%" and that accidents had also "increased markedly." An expert witness for the plaintiff, Richard Carpenter, executive director of the South Western Regional Planning Agency, testified that conditions on the highway constituted "a crisis situation." In the absence of any challenge to the factual accuracy of this record, which sustains the trial court's ruling, the plaintiff cannot prevail on this issue.

The record also defeats the plaintiff's contention that the trial court erred in concluding that the department of transportation had undertaken emergency measures "in response to an immediate threat to public health and safety." The trial court found immediacy in the unforeseen increased risk of truck accidents associated with the increase in the use of Interstate Highway 95 after the removal of tolls. The court found operator impairment or truck defects to be a "threat to public . . . safety." Again, this finding is supported by testimony offered by a witness for the plaintiff. When Martha S. Hauhuth, first selectwoman of the town of Westport, was asked whether she believed "that traffic conditions on the Connecticut Turnpike pose an immediate threat to the public health and safety," she

responded: "Immediate and that has been present for a long time." Taking into account the understanding that the Westport station was a temporary measure to respond to a perceived crisis while long term solutions were under consideration, we cannot fault the trial court's fact-bound determination that the defendants' actions fell within the exemption of § 22a-1c.

There is no error.

In this opinion the other justices concurred.