[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION STATEMENT OF APPEAL
The plaintiff, Connecticut Light and Power Company (CLP or the company), appeals from the August 8, 2001 final decision by the defendant, the department of public utility control (DPUC or the department), in Docket No. 00-09-04, ordering the company to reduce nuclear stranded costs by the net proceeds from the sale of two parcels of land in Stamford, Connecticut and disallowing $593,497 of expenses incurred in connection with that sale in determining net proceeds available to offset stranded costs. The present appeal requires the court to interpret provisions of Public Act 98-28,[1] which is codified at General Statutes §§ 16-244 et seq. This appeal is authorized by General Statutes §§ 4-183 and 16-35.
 BACKGROUND
The administrative record provides the following relevant facts. On August 31, 2000, the plaintiff filed an application with the DPUC seeking the department's approval of the sale of two adjacent parcels of land located in Stamford, Connecticut on the Stamford Harbor. (Return of Record (ROR), Item I.) Parcel 1 consists of approximately fourteen acres of improved non-utility property which has never been in rate base and which has been continuously operated as a boating marina since CLP purchased it in 1970. (Id., p. 2.) Parcel 2 consists of approximately twenty-five acres of improved utility property and was used, at one time, for gas and electric operations. (Id., p. 2.) Prior to 1999, the two parcels were separated by a strip of land owned by the Ponus Yacht Club (Ponus). In Docket No. 98-08-05, however, dated August 18, 1999 and entitled "Application of the Connecticut Light and Power Company for the Exchange of Land and Rights in Stamford, Connecticut," the department approved an exchange of land and rights between CLP and Ponus. In that transaction, Ponus transferred ownership of the strip of land separating parcels 1 and 2 to CLP in return for permanent rights to ingress and egress across parcel 2. The exchange resolved long-standing disputes between the two sides and greatly facilitated the commercial development of parcel 1, which had been landlocked up until that time. In its decision, the department stated: "As a result of the transaction, Parcel 1 is expected to appreciate in value substantially. Conversely, the value of Parcel 2 will decrease. The Department believes that without the investment of the portions of property from Parcel 2 in this transaction, the value of Parcel 1 would not increase to the extent the Company has estimated. The Department does not believe that CLP ratepayers should be worse off as a result of this transaction while shareholders receive all the benefits. Therefore, the Department concludes that any gain incurred due to a subsequent sale of Parcel 1 should be shared on the basis of 75% to shareholders and 25% to ratepayers. Any gain from the future sale will be recorded consistent with Public Act 98-28, An Act Concerning Electric Restructuring, Section CT Page 9665 8, Subsection (h)(3) and (4), which requires that all gains from the sales of real property occurring after July 1, 1998, be used to reduce the total amount of nuclear stranded costs." Id., p. 5.
In Docket No. 00-09-04, which forms the basis of this appeal, the department approved the sale of the two parcels of land to the Strand/BRC Group. Pursuant to General Statutes § 16-245e (h)(4),[2] however, and contrary to the department's decision in Docket No. 98-08-05, the department ordered that the company apply all of the net gain from the sale to reduce nuclear stranded costs. (ROR, Item X-1, Decision, p. 8.) The department stated simply that "[a] prior conclusion in the August 18, 1999 Decision of the Docket No. 98-08-05 . . . stated that the shareholders and ratepayers could share the gain from the future sale of this property. That conclusion was in error and the total gain to CLP from this sale shall be used to reduce stranded costs." (Id.) The department allowed recovery of $496,890 of the company's transaction costs incurred in the sale, but disallowed $505,082 of costs claimed by the company, stating that those costs had been incurred in prior sale attempts and were not "necessary for the current sale." (Id., p. 7.) The department disallowed an additional $88,415 of internal labor costs claimed by the company as well, stating that "the company currently recovers operating expenses, including the costs of its legal and real estate departments, in rates. Therefore, the Department does not allow internal costs, past or present, to be deducted [from] the sales proceeds." (Id., p. 7.)
Presently before the court is CLP's appeal of the department's disallowance of the $593,497 in costs as well as its appeal of the department's order that the entire gain from the sale of both parcels of land be used to reduce stranded costs. As grounds for the appeal, the company alleges that the department's decision ordering it to apply the proceeds from the sale of parcel 1 to reduce stranded costs constitutes an unconstitutional taking of non-utility property since parcel 1 was never in rate base. "Such action of the Department is a reversal without explanation or justification of prior precedent and decisions of the Department in which the Department has recognized that customers, because they have not contributed to the purchase or maintenance of non-utility property, are not entitled to share in the gain arising from, or required to bear their share of any loss associated with, the sale of non-utility property." (Appeal, ¶ 24.) The company further alleges that the department's disallowance of the transactional costs incurred in its prior sale attempts with the Strand/BRC Group violates General Statutes § 16-244f (a)(2), which defines "net proceeds" received by an electric company for the sale of real property as the "book income from the sale. . . less reasonable expenses of sale. . . ." (Appeal, ¶ 26.) Finally, the company alleges that there is no evidence in the record CT Page 9666 to support the department's factual finding that $88,415 of CLP's internal labor costs were previously recovered in rates. (Appeal, ¶ 30.)
 STANDARD OF REVIEW
"The standard of review of an agency decision is well established. Ordinarily, [the] court affords deference to the construction of a statute applied by the administrative agency empowered by law to carry out the statute's purposes. . . . [A]n agency's factual and discretionary determinations are to be accorded considerable weight by the courts. . . . Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . Furthermore, when a state agency's determination of a question of law has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference. . . . [I]t is for the courts, and not administrative agencies, to expound and apply governing principles of law." Office ofConsumer Counsel v. Dept. of Public Utility Control, 252 Conn. 115, 120,742 A.2d 1257 (2000). Because the Restructuring Act was recently enacted and has not been the subject of time-tested judicial review, the department's interpretation of the act's provisions is entitled to no deference.
 DISCUSSION
1. Whether § 16-245e (h)(4)(C) abrogated the common law
CLP first argues that the department erroneously interpreted §16-245e (h)(4)(C) as requiring that the net after tax gain from the sale of parcel 1, non-utility property, be used to reduce nuclear stranded costs. (Plaintiff's Brief, p. 16-17.) CLP asserts that if the legislature had intended to abrogate the common law rule which holds that customers have no right to share in the gain from the sale of non-utility property, then that intent would have been expressly evident on the face of the statute. (Plaintiff's Brief, p. 21.) CLP concludes that "[t]he DPUC erred in interpreting the phrase `any real property' in a vacuum, rather than in consideration of the common law and statutory context existing when the [act] was enacted. When placed in that context, Section16-245e (h)(4)(C) is properly understood to refer to any utility real property, not no-nutility property in which customers have no economic or equitable interest. . . ."[3] (Emphasis in original.) (Id., p. 20.) As support for its argument, CLP cites Connecticut Light Power Co. v.Department of Public Utility Control, 219 Conn. 51, 69-70, 551 A.2d 1231
(1991), wherein our Supreme Court recognizes "the validity" of the common CT Page 9667 law principle that "the gains on the sale of the utility company land that was never included in rate base and therefore never supported by ratepayers belong to the shareholders." (Internal quotation marks omitted.) CLP also cites General Statutes § 16-43 (e)[4] as an example of the legislature expressly waiving the common law rule with respect to the allocation of proceeds from the sale of water company land.
The department counters that the plain and unambiguous language of the Restructuring Act, together with the act's history and purpose, evidences the legislature's clear intent to depart from the common law rule for the purpose of restructuring the electric power industry. (Department's Brief, pp. 10-12.) The court agrees with the department.
"In determining whether or not a statute abrogates or modifies a common law rule the construction must be strict, and the operation of a statute in derogation of the common law is to be limited to matters clearly brought within its scope. . . . Although the legislature may eliminate a common law right by statute, the presumption that the legislature does not have such a purpose can be overcome only if the legislative intent is clearly and plainly expressed." Alvarez v. New Haven Register, Inc.,249 Conn. 709, 715, 735 A.2d 306 (1999). The intent of the legislature to abrogate a common law rule is discernible in the language, history and purpose of the statute. Id. see also Cunha v. Colon, 260 Conn. 15, 19,735 A.2d 306 (2002) ("[w]e . . . carefully examined the language, history and purpose of [the statute] to determine whether it [abrogates the] common-law doctrine.")
Section 16-245e (h)(4)(C) provides, in relevant part, that "[a]fter the department has calculated the total value of stranded costs for all nuclear generation assets, the department shall . . . (C) reduce such amount by the net proceeds that are above book value received by an electric company for the sale or lease of any real property after July 1, 1998." (Emphasis added.) "It is an axiom of statutory construction that legislative intent is to be determined by an analysis of the language actually used in the legislation. . . . [W]hen the language of a statute is plain and unambiguous, we need look no further than the words themselves because we assume that the language expresses the legislature's intent." Rizzo Pool Co. v. Del Grosso, 240 Conn. 58, 73-74,689 A.2d 1097 (1997). "[L]egislative intent is to be found, not in what the legislature intended to say, but in the meaning of what it did say. . . . We must construe a statute without reference to whether we feel that it might be improved by adding to it or interpreting it differently. . . . It is our duty to apply the law, not to make it." (Citations omitted; internal quotation marks omitted.) Commissioner ofAdministrative Services v. Grace, 40 Conn. App. 829, 833, 673 A.2d 1172
CT Page 9668 (1996).
In the court's view, there is nothing ambiguous about the meaning of the word "any" in the context of § 16-245e (h)(4)(C) — it means "all." This view is consistent with several Supreme Court decisions interpreting the word "any" in the context of other statutory schemes. See, e.g., Dowling v. Slotnik, 244 Conn. 781, 802, 712 A.2d 396 (1998);Donohue v. Zoning Board of Appeals, 155 Conn. 550, 556, 235 A.2d 643
(1967); Muller v. Town Plan Zoning Commission, 145 Conn. 325, 328,142 A.2d 524 (1958). Moreover, in construing a statute, "[n]o part . . . is to be treated as insignificant or unnecessary, and there is a presumption of purpose behind every sentence, clause or phrase . . . [so that] no word [or phrase] in a statute is to be treated as superfluous. . . ." (Citation omitted; internal quotation marks omitted.) Willoughbyv. New Haven, 254 Conn. 404, 422, 757 A.2d 1083 (2000). Thus, under well established rules of statutory construction, the court is compelled to attach significance to, as well as infer intent from, the legislature's use of the word "any" as a modifier of "real property." Rizzo Pool Co.v. Del Grosso, supra, 240 Conn. 73-74.) That significance is underscored by the fact that utility assets are otherwise carefully distinguished by kind and use throughout the act, indicating that if the legislature had wanted to limit § 16-245e (h)(4)(C) to any "utility" real property it would have done so.[5]
The language of § 16-245e (h)(4)(C) is also consistent with § 16-245e (c)(1), which provides, in relevant part: "[A]ny electric company seeking to claim stranded costs shall, in accordance with this subsection, mitigate such costs to the fullest extent possible. Prior to the approval by the department of any stranded costs, the electric company shall show to the satisfaction of the department that the electric company has taken all reasonable steps to mitigate to the maximum extent possible the total amount of stranded costs that it seeks to claim and to minimize the cost to be recovered from customers. . . . Mitigation may include, but is not limited to . . . reduction of book assets by application of net proceeds of any sale of existingassets. . . ." (Emphasis added.) Thus, the use of the proceeds from the sale of non-utility property to mitigate nuclear stranded costs is not unique to § 16-245e (h)(4)(c) but is, rather, a consistent statutory theme.
In addition to the clear and unambiguous language of § 16-245e, the legislative history of the Restructuring Act supports the view that the act represents a dramatic and historic departure from the old regulatory scheme under which the common law rule existed. See, e.g., 41 5. Proc., Pt. 4, 1998 Sess., p. 1121, remarks of Senator Steve Somma, ("[t]oday, we really have a historic moment here in Connecticut legislative history with Substitute Bill HB5005, An Act Concerning Electric Restructuring, CT Page 9669 which came out of the House with a convincing 126 to 17 vote. This charts a new course to move Connecticut away from the 60 year old tradition of only providing electric service through high cost regulated monopolies to a new competitive system. . . ."); 41 H.R. Proc., pt. 4, 1998 Sess., p. 1107, remarks of Representative Miller ("I don't think there's any other legislation that we're going to see in this century that's going to impact the citizens of the state of Connecticut like this particular bill does."); 41 H.R. Proc., Pt. 4, 1998 Sess., p. 1078, remarks of Representative Eberle ("[t]his bill has been at least four years in the making, with several months of DPUC hearings before that, two years of detailed and wide-ranging task force study and two years of intense drafting and negotiations by the Energy and Technology Committee."). With specific regard to the provisions of the act covering the calculation and securitization of stranded costs, there are the words of Representative Eberle, stating that "[t]his bill is a complete package that has been very, very difficult to negotiate. Virtually all of the parts are related to each other. And changing one has a ripple effect throughout the bill." 41 H.R. Proc., pt. 4, 1998 Sess., p. 1100. Indeed, it is inconceivable to this court that the common law rule survived what is, in the words of one senator, "one of the most complicated, most complex, most difficult and most challenging bills," 41 S. Proc., pt. 4, 1998 Sess., p. 1189, remarks of Senator Sullivan, to come before the general assembly and which, quite simply, rewrote the rules under which electric power is generated, distributed and sold in our state.
Finally, the court is mindful that "in seeking to ascertain the intent of the legislature . . . we are guided by the golden rule of statutory interpretation . . . that the legislature is presumed to have intended a reasonable, just and constitutional result." (Internal quotation marks omitted.) Giaimo v. New Haven, 257 Conn. 481, 494, 778 A.2d 33 (2001). Notably, that "golden rule" is codified in the Restructuring Act at General Statues § 16-244 (11), which provides that "the transition to a competitive generation market, including the determination of stranded costs, should be based on the principles of fairness and reasonableness and the result of a balance of the interests of electric customers, electric utilities and the public at large. . . ."
The court concludes, therefore, based on the clear and unambiguous language of § 16-245e (h)(4)(C), and the legislative history and purpose surrounding the Restructuring Act, that § 16-245e abrogated the common law rule for the purpose of reducing an electric company's nuclear stranded costs. CLP's appeal of the department's decision ordering it to apply the net proceeds from the sale of parcels 1 and 2 to offset stranded costs is, accordingly, dismissed.
2. Whether the DPUC erred in denying CLP recovery expenses of saleCT Page 9670 incurred in prior sale attempts
CLP argues that the department erred in disallowing $593,471 of costs the company incurred in earlier attempts to sell parcel 1 to Strand/BCR, the ultimate purchaser of the property. CLP asserts that "[t]he DPUC made no finding that any of these costs claimed by CLP as expenses of sale were unreasonable and the record amply supports a finding that those costs were in fact reasonable." (Plaintiff's Brief, p. 26.) CLP further argues that the department arbitrarily substituted the reasonableness standard embodied in § 16-244f (a)(2) for a "necessary for the current sale" standard. CLP concludes that "[h]ad the legislature intended Section 16-244f (a)(2) to have such a narrowly defined scope, it would have said so." (Plaintiff's Brief, p. 27.)
The department counters that, in conformance with §§ 16-245e (h)(4) (C) and 16-244f (a)(2), it permitted recovery of those transaction costs that resulted in the present sale of the property. (Department's Brief, p. 22.) The department argues that there is no evidence in the record that the present sale resulted from CLP's attempts, in 1987 and 1994, to sell parcel 1 to Strand/BCR, or that negotiations between CLP and Strand/BCR resumed after 1994. (Department's Brief, p. 25.) Instead, the department argues that the present sale was the product of a request for proposals (RFP) process, in which more than one party bided on the property. (Defendant's Brief, p. 24.) CLP counters, however, that "[t]he results of the REP simply made clear that the Strand proposal reflected the most value-maximizing transaction and that transaction, which originated in the 1987 and 1994 Agreements, is now being consummated." (Plaintiff's Brief, p. 28.)
Section 16-245e (h)(4)(C) provides that the total value of CLP's nuclear stranded costs shall be reduced by the amount of the "net proceeds" that are above book value received from the sale of real property. Section 16-244f (a)(2) defines "net proceeds" as the "book income from the sale . . . of assets, consisting of sales prices less reasonable expenses of sale. . . ."
The court disagrees with CLP's claim that the department employed a standard for calculating net proceeds other than the standard articulated in § 16-244f (a)(2). In it's decision, the department states: "§§ 16-245e (h)(4)(c) and 16-244f (a)(2) allow reasonable expenses of sale of real property . . . to be subtracted from the sales proceeds in determining net proceeds available to offset stranded costs.) (ROR, Item X-1, Decision, p. 7.) The department expressly found, however, that "CLP twice attempted to sell Parcel 1, once in 1987 and again in 1994. In 1987, the Company had a signed agreement. However, the buyer withdrew from the contract citing the decline of the real estate market and CT Page 9671 opposition from the Ponus Yacht Club. In 1994, the Company entered into an agreement giving the buyer an option to purchase the property. That agreement never came to fruition." (ROR, Item X-1, Decision, p. 3.) The department further found that the present sale was not a continuation of the 1987 and 1994 negotiations but, rather, the product of an RFP process. (Id., p. 7.)
CLP's disagreement with the department is, ultimately, a disagreement over the department's factual determination that the costs incurred by CLP in its negotiations with Strand/BCR in 1987 and 1994 were unrelated to the 2001 sale. "The substantial evidence rule governs judicial review of administrative fact-finding under UAPA. General Statutes § 4-183
(j)(5) and (6). Substantial evidence exists if the administrative record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . This substantial evidence standard is highly deferential and permits less judicial scrutiny than a clearly erroneous or weight of the evidence standard of review. . . ." (Internal quotation marks omitted.) MacDermid, Inc. v. Dept. of Environmental Protection,257 Conn. 128, 136-37 (2001). See also Rene Dry Wall Co. v. StrawberryHill Associates, 182 Conn. 568, 573, 438 A.2d 774 (1980) (trial court's determination regarding reasonableness of costs under mechanic's lien statute is a finding of fact)
An examination of the record reveals substantial evidence to support the department's findings that the costs incurred by CLP in its negotiations with Strand/BCR in 1987 and 1994 were not incurred in connection to the present sale. First, on July 1, 1999, CLP solicited requests for proposals from all brownfield developers for the development of parcels 1 and 2. (ROR, Item IV-1, Response to DPUC Interrogatory EL-001.) Five developers submitted proposals in response to that RFP. (ROR, Item XIV-1.) Finally, the testimony of Sal Giuliano, the manager of real estate and planning for CLP, contradicts CLP's argument that the RFP was, essentially, an academic exercise and that the present sale was simply the culmination of ongoing negotiations between CLP and Strand/BCR that began in 1987. At a hearing on CLP's application, Giuliano testified that in 1987, the company signed a contract with Strand/BCR for the sale of parcel 1 but that, "as the market began to change drastically through the mid-1980s . . . and as the market really began to collapse in the late eighties . . . Strand pulled their application for two reasons: the collapse in the real estate economy and there was some opposition from the Ponus Yacht Club. . . . As — as we move closer into current times, as the market began to rebound during the mid and then late 1990s, interest in redevelopment of the South End, again, became very important for the city, [the] future for the property began, again, for Northeast Utilities to become very important as — as projects were proposed. In the mid 1990s an entrepreneur who CT Page 9672 owned a minor league hockey franchise proposed to possibly build a hockey arena on-site. We entertained that for a period of time. Unfortunately, that did not materialize. Passenger ferry operators became interested in the property to possibly run shuttle services from Fairfield county, from Stamford Harbor and to points of Manhattan and Long Island. The City prepared its revitalization plan, redevelopment plan for the entire Stamford South End district, and the Northeast Utilities parcel became and is considered a key component of that overall redevelopment plan. Based on — based on the interest that was created in . . . the property, given this massive effort that the City was undertaking, Northeast Utilities requested — sent out requests for proposals from the different developers that expressed interest, and the proposal that we accepted, again is the subject of this docket." (ROR, Item VI-1, pp. 10-14.)
Substantial evidence exists in the record to support the department's finding that the expenses incurred by CLP in its prior efforts to sell parcels 1 and 2 to Strand/BCR were not expenses of the present sale. CLP's appeal of the department's disallowance of the $593,471 in prior transactional costs is, accordingly, dismissed.
3. Whether the department erred in disallowing $88,415 of CLP'sinternal labor costs
Finally, CLP argues that the department erred in its finding that $88,415 of internal labor costs incurred by CLP in the present transaction were already recovered in rates. The company asserts that "[t] hose internal labor costs were not expensed or included in CLP's rates, but were deferred to a balance sheet account which accumulated all costs associated with the transaction. Those costs were recorded in Account 108 (Retirement Work in Progress) while the transaction was pending and, upon closing of the transaction will be transferred from Account 108 and applied against the gain on the sale." (Plaintiff's Brief, p. 29.)
The department argues that the company's internal labor costs were recovered through customer rates, as employee labor costs. (Department's Brief, p. 28.) Both sides cite to the same evidence in the record as support for their respective positions. As previously noted, the court reviews the department's factual findings pursuant to the highly deferential "substantial evidence" standard. MacDermid Inc. v. Dept. ofEnvironmental Protection, supra, 257 Conn. 136-37.
In an interrogatory dated May 7, 2001, the department requested that CLP provide "all journal entries for Transaction Costs. If transaction costs were included in Rate Base, please provide the interest component CT Page 9673 supported by customers." (ROR, Item V-2.) CLP provided the following response: "Account 108 is included in the Company's rate base and therefore any transaction costs that are booked to account 108 have an impact on the Company's rate base. In the case of the Stamford land sale, however, the transaction costs were significantly offset (reduced) by a deposit of $550,000 that was received in 1987 and recorded as a credit to account 108. In fact, the net impact on account 108 as a result of the Stamford land sale was a credit until 1993 when the cumulative transaction costs first exceeded the deposit of $550,000. This time frame is important because it indicates that customers' rates in the late 1980s and through the period covered by Docket No. 92-11-11 and Docket No. 92-11-11 Settlement (effective mid 1996) reflected a credit in rate base. It wasn't until September 1998 when Docket No. 98-01-02 established rates that were based on data that reflected a net debit balance in account 108 of approximately $108,000 as a result of the Stamford Land Sale. Over the past 12 years or so, customers' rates reflected a credit in rate base for roughly 10 years and a debit in rate base for roughly 2 years. The net cumulative impact would be a benefit to customers, albeit immaterial." (ROR, Item V-2.)
Also, at a hearing on CLP's application to sell parcels 1 and 2, Giuliano was asked:
 "Q. [H]as the company hired personnel whose specific purpose was to complete these transactions or would these internal costs be using existing personnel at any given point in time that these costs were incurred since the eighties?
 "A. These internal costs are costs incurred by company employees. . . . These are . . . employees that were and are within the real estate group, for instance, and as they are working on this specific transaction, they allocate their time accordingly to work orders which accumulate expenses for this particular transaction."
(ROR, Item VI-1, p. 124.)
There is substantial evidence in the record to support the department's finding that the internal labor costs incurred in the present transaction were recovered by the company in rates. The company acknowledges that internal labor costs incurred in connection with the sale of parcels 1 and 2 were booked to account 108. (ROR, Item V-2.) The company further acknowledges that "[a]ccount 108 is included in the Company's rate base and therefore any transaction costs that are booked to account 108 have CT Page 9674 an impact on the Company's rate base." (Id.) The company also acknowledges that there was a credit in account 108 until 1993, but at that time "the cumulative transaction costs first exceeded the deposit of $550,000."[6] (Id.) Finally, the company acknowledges that since September 1998, rates have been based on data that reflects a net debit balance in account 108." (Id.) It is clear, therefore, that since at least 1998, the company has been recovering its internal labor costs booked to account 108. The company's appeal of the department's disallowance of those costs is, accordingly, dismissed.
 CONCLUSION
For the foregoing reasons, CLP's appeal of the department's decision in Docket No. 00-09-04 is dismissed.
Owens, J.