# OFFICE OF CONSUMER COUNSEL *v.* DEPARTMENT OF PUBLIC UTILITY CONTROL ET AL.
## (SC 16106)

Borden, Norcott, Palmer, Sullivan and Callahan, Js.

Argued November 2, 1999—officially released January 25, 2000

*Bruce C. Johnson*, with whom, on the brief, was *Guy R. Mazza*, for the appellant (plaintiff).

*Robert S. Golden, Jr.*, assistant attorney general, with whom, on the brief, was *Richard Blumenthal*, attorney general, for the appellee (named defendant).

*Frederic L. Klein*, with whom was *Kenneth H. Eagle*, for the appellee (defendant Connecticut Light and Power Company).

*Opinion*

CALLAHAN, J. This is an appeal from the judgment of the trial court dismissing the plaintiff's administrative appeal from an interim rate determination of the named defendant, the department of public utility control (department). The department's decision that is the subject of the present appeal reduced electricity rates through a rate base reduction and amortization of regulatory assets. The outcome of this appeal hinges upon the interpretation of General Statutes § 16-19 (g),[1] the

---

[1] General Statutes § 16-19 (g) provides: "The department shall hold a special public hearing on the need for an interim rate decrease (1) when a public service company has, for six consecutive months, earned a return on equity which exceeds the return authorized by the department by at least one percentage point, (2) if it finds that any change in municipal, state or federal tax law creates a significant increase in a company's rate of return, or (3) if it finds that a public service company may be collecting rates which are more than just, reasonable and adequate, as determined by the department, provided the department shall require appropriate notice of hearing to the company and its customers who would be affected by an

interim rate decrease statute. The plaintiff, the office of consumer counsel, claims on appeal that the trial court improperly: (1) substituted its judgment for that of the department when it determined that accelerating amortization of regulatory assets directly benefits ratepayers; (2) concluded as a matter of law that the interim rate decrease statute does not require a cash rate reduction in the absence of a showing of direct benefit to ratepayers; and (3) permitted amortization of regulatory assets instead of requiring an actual cash decrease in rates as mandated by statute. We disagree and we therefore affirm the judgment of the trial court.

The defendant Connecticut Light and Power Company (power company) is a public utility company regulated by the department. Pursuant to its statutorily mandated duty under General Statutes § 16-19a,[2] the

interim rate decrease in such form as the department deems reasonable. At such hearing, the company shall be required to demonstrate to the satisfaction of the department that earning such a return on equity or collecting rates which are more than just, reasonable and adequate is directly beneficial to its customers. At the completion of such hearing, the department may order an interim rate decrease if it finds that such return on equity or rates exceed a reasonable rate of return or are more than just, reasonable and adequate as determined by the department. Any such interim rate decrease shall be subject to a customer surcharge if the interim rates collected by the company are less than the rates finally approved by the department or fixed at the conclusion of any appeal taken as a result of any finding by the department. Such surcharge shall be assessed against customers in such amounts and by such procedure as ordered by the department."

[2] General Statutes § 16-19a (a) provides: "The Department of Public Utility Control shall, at intervals of not more than four years from the last previous general rate hearing of each gas, electric and electric distribution company having more than seventy-five thousand customers, conduct a complete review and investigation of the financial and operating records of each such company and hold a public hearing to determine whether the rates of each such company are unreasonably discriminatory or more or less than just, reasonable and adequate, or that the service furnished by such company is inadequate to or in excess of public necessity and convenience or that the rates do not conform to the principles and guidelines set forth in section 16-19e. In making such determination, the department shall consider the gross and net earnings of such company since its last previous general rate

department conducted a periodic review of the power company in 1997. The periodic review revealed that the power company would likely have substantial overearnings. The department, therefore, instituted a two-phase process. The first phase was an interim rate decrease hearing from which a decision was issued on February 25, 1998. The second phase consisted of a full rate case, which was concluded on February 5, 1999. The final result of the full rate case is not at issue. In this appeal, only the result of the interim rate decrease hearing is at issue.

The interim rate decrease procedure, which was the procedure undertaken by the department, is set out in § 16-19 (g). Section 16-19 (g) requires the department to conduct a hearing on the need for an interim rate decrease when certain triggering events occur. The impetus for a hearing in this case was the department's finding at the periodic review that the power company would be overearning by at least $141 million.[3] "At the completion of such hearing, the department may order an interim rate decrease if it finds that such return on equity or rates exceed a reasonable rate of return or are more than just, reasonable and adequate as determined by the department. Any such interim rate decrease shall be subject to a customer surcharge if the interim rates collected by the company are less than the rates finally approved by the department or fixed at the conclusion of any appeal taken as a result of any finding by the department. Such surcharge shall be assessed against customers in such amounts and by

hearing, its retained earnings, its actual and proposed capital expenditures, its advertising expenses, the dividends paid to its stockholders, the rate of return paid on its preferred stock, bonds, debentures and other obligations, its credit rating, and such other financial and operating information as the department may deem pertinent."

[3] Additionally, the department found that the power company might be overearning as much as $291 million—the $150 million balance not addressed by the interim rate hearing to be considered as part of the full rate case.

such procedure as ordered by the department." General Statutes § 16-19 (g).

Pursuant to its mandate under General Statutes § 16-2a,[4] the plaintiff participated in the interim rate decrease hearing. Among the department's considerations at the hearing was the "tenuous" financial condition of the power company[5] brought about by its nuclear operations that had cost it more than one billion dollars, which the department had not permitted the power company to collect from its ratepayers. At the close of the interim rate decrease hearing, the department allowed the power company to apply approximately

[4] General Statutes § 16-2a (a) provides: "There shall continue to be an independent Office of Consumer Counsel, within the Department of Public Utility Control for administrative purposes only, to act as the advocate for consumer interests in all matters which may affect Connecticut consumers with respect to public service companies, electric suppliers and persons, firms and corporations certified, or seeking to be certified, to provide intrastate telecommunications service pursuant to sections 16-247f to 16-247h, inclusive. The Office of Consumer Counsel is authorized to appear in and participate in any regulatory or judicial proceedings, federal or state, in which such interests of Connecticut consumers may be involved, or in which matters affecting utility services rendered or to be rendered in this state may be involved. The Office of Consumer Counsel shall be a party to each contested case before the Department of Public Utility Control and shall participate in such proceedings to the extent it deems necessary. Said Office of Consumer Counsel may appeal from a decision, order or authorization in any such state regulatory proceeding notwithstanding its failure to appear or participate in said proceeding."

[5] The department's § 16-19a periodic review decision stated: "In light of the [power company's] financial condition, the [d]epartment will consider write down of regulatory assets as a primary means of addressing overearnings while taking into account the needs of and fairness to ratepayers." Department of Public Utility Control Financial and Operations Review of the Connecticut Light & Power Co., Docket No. 97-05-12 (December 31, 1997) p. 1.

In its § 16-19 (g) interim rate decision, the department noted that "the [d]epartment recognizes the [power company's] tenuous financial condition. In light of the [d]epartment's concern about the [power company's] finances, the [d]epartment believes it is in the public interest to apply the majority of the reduction on a non-cash basis." Department of Public Utility Control Review of the Connecticut Light & Power Co.'s Rates and Charges, Docket No. 98-01-02 (February 25, 1998) p. 4.

$110.5 million of its projected overearnings toward accelerated amortization of certain regulatory assets as part of an interim rate decrease.[6] The department also, however, deleted approximately $30.5 million from the rate base that represented Millstone Unit I, resulting in a 1.4 percent cash rate reduction. The plaintiff objected only to the $110.5 million of accelerated amortization. This appeal followed.

I

As a preliminary matter, we set forth our standard of review. "The standard of review of an agency decision is well established. Ordinarily, this court affords deference to the construction of a statute applied by the administrative agency empowered by law to carry out the statute's purposes. . . . [A]n agency's factual and discretionary determinations are to be accorded considerable weight by the courts. . . . Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . Furthermore, when a state agency's determination of a question of law has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference. . . . [I]t is for the courts, and not administrative agencies, to expound and apply governing principles of law. . . . *Connecticut Light & Power Co.* v. *Texas-Ohio Power, Inc.*, 243 Conn. 635, 642–43, 708 A.2d 202 (1998). . . . *Assn. of Not-for-Profit Providers for the Aging* v. *Dept. of Social Services*, 244 Conn. 378, 389, 709 A.2d 1116 (1998)." (Inter-

---

[6] This amount was distributed between two assets that represent $700 million in ratepayer liability. Approximately $100 million was designated for amortization of a Statement of Financial Accounting Standards (FAS) 109 account, which represents deferred taxes. Approximately $10 million was designated for amortization of a conservation and load management asset.

nal quotation marks omitted.) *Sweetman* v. *State Elections Enforcement Commission*, 249 Conn. 296, 305–306, 732 A.2d 144 (1999). "If, however, a governmental agency's 'time-tested' interpretation of a statute is reasonable, that interpretation should be accorded great weight by the courts. *Anderson* v. *Ludgin*, 175 Conn. 545, 555–56, 400 A.2d 712 (1978); *New Haven* v. *United Illuminating Co.*, 168 Conn. 478, 493, 362 A.2d 785 (1975)." *Texaco Refining & Marketing Co.* v. *Commissioner of Revenue Services*, 202 Conn. 583, 599, 522 A.2d 771 (1987). Because this case presents an issue of law never before specifically considered by the department or by the courts, our review is plenary.

## II

We believe that a determination of whether the statutory authority to reduce rates on an interim basis provided by § 16-19 (g) is mandatory or discretionary is determinative of this appeal. We conclude that the statutory direction of § 16-19 (g) is discretionary in nature.

We begin our analysis with the text of the statute. Section 16-19 (g) provides that "[a]t the completion of [the interim rate decrease] hearing, the department *may* order an interim rate decrease if it finds that such return on equity or rates exceed a reasonable rate of return or are more than just, reasonable and adequate as determined by the department. . . ." (Emphasis added.) "It is well established that [i]f . . . language . . . is clear and unambiguous, we will interpret it in accordance with its plain meaning absent a compelling reason to the contrary. . . . *State* v. *Angell*, 237 Conn. 321, 327, 677 A.2d 912 (1996)." (Internal quotation marks omitted.) *Richard Riggio & Sons, Inc.* v. *Galiette*, 46 Conn. App. 63, 66, 698 A.2d 336, cert. denied, 243 Conn. 920, 701 A.2d 343 (1997), cert. denied, 522 U.S. 1115, 118 S. Ct. 1050, 140 L. Ed. 2d 113 (1998). The statutory language of § 16-19 (g) is clear: "the department *may* order an

interim rate decrease . . . ." (Emphasis added.) "We have consistently held that 'may' is directory rather than mandatory. See, e.g., *Seals* v. *Hickey*, 186 Conn. 337, 345–47, 441 A.2d 604 (1982). The word 'may,' unless the context in which it is employed requires otherwise, ordinarily does not connote a command. Rather, the word generally imports permissive conduct and the conferral of discretion. See id., 345; *Ridgeway* v. *Ridgeway*, 180 Conn. 533, 540, 429 A.2d 801 (1980); see also *A. Dubreuil & Sons, Inc.* v. *Lisbon*, 215 Conn. 604, 611, 577 A.2d 709 (1990)." *Commission on Human Rights & Opportunities* v. *Truelove & Maclean, Inc.*, 238 Conn. 337, 349, 680 A.2d 1261 (1996) (statutory language of General Statutes § 46a-86 [b], providing that hearing officer, upon finding discriminatory employment practices, "*may* order the hiring or reinstatement of employees, with or without back pay," is discretionary [emphasis added]).

The legislature's use of the word "shall" in other contexts in § 16-19 (g) further bolsters our interpretation.[7] "The use of the word 'shall' in conjunction with the word 'may' confirms that the legislature 'acted with complete awareness of their different meanings'; *Hartford Principals' & Supervisors' Assn.* v. *Shedd*, 202 Conn. 492, 506, 522 A.2d 264 (1987); and that it intended the terms to have different meanings. *Hinchliffe* v. *American Motors Corp.*, 184 Conn. 607, 613, 440 A.2d 810 (1981) (use of different terms within same sentence of statute 'plainly' implies different meanings intended), aff'd, 192 Conn. 252, 470 A.2d 1216 (1984); see also *Plourde* v. *Liburdi*, 207 Conn. 412, 416, 540 A.2d 1054 (1988)." *Angelsea Productions, Inc.* v. *Commission on Human Rights & Opportunities*, 236 Conn. 681, 694–95, 674 A.2d 1300 (1996). The plain language of the statute

---

[7] See footnote 1 of this opinion.

leaves to the discretion of the department whether to order any interim rate decrease at all.[8]

We also may consider the regulatory purpose articulated in General Statutes § 16-19e.[9] Section 16-19e (a) provides in relevant part that "[i]n the exercise of its powers under the provisions of this title, the Department of Public Utility Control shall examine and regulate . . . the establishment of the level and structure

---

[8] The legislative history of House Bill No. 7216, which included the text of § 16-19 (g), also supports this conclusion. Senator Gary A. Hale noted that the department "will be *authorized* to grant a utility rate decrease without a full hearing under special circumstances." (Emphasis added.) 30 S. Proc., Pt. 11, 1987 Sess., pp. 4040–41. The title of the bill is also of significance: "AN ACT PERMITTING THE DEPARTMENT OF PUBLIC UTILITY CONTROLS TO ORDER INTERIM RATE DECREASES." Significantly, the department is permitted and authorized, but not mandated, to decrease rates.

[9] General Statutes § 16-19e (a) provides: "In the exercise of its powers under the provisions of this title, the Department of Public Utility Control shall examine and regulate the transfer of existing assets and franchises, the expansion of the plant and equipment of existing public service companies, the operations and internal workings of public service companies and the establishment of the level and structure of rates in accordance with the following principles: (1) That there is a clear public need for the service being proposed or provided; (2) that the public service company shall be fully competent to provide efficient and adequate service to the public in that such company is technically, financially and managerially expert and efficient; (3) that the department and all public service companies shall perform all of their respective public responsibilities with economy, efficiency and care for the public safety, and so as to promote economic development within the state with consideration for energy and water conservation, energy efficiency and the development and utilization of renewable sources of energy and for the prudent management of the natural environment; (4) that the level and structure of rates be sufficient, but no more than sufficient, to allow public service companies to cover their operating and capital costs, to attract needed capital and to maintain their financial integrity, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable; (5) that the level and structure of rates charged customers shall reflect prudent and efficient management of the franchise operation and (6) that the rates, charges, conditions of service and categories of service of the companies not discriminate against customers which utilize renewable energy sources or cogeneration technology to meet a portion of their energy requirements."

of rates in accordance with the following principles . . . (4) that the level and structure of rates be sufficient, but no more than sufficient, to allow public service companies to cover their operating and capital costs, to attract needed capital and to maintain their financial integrity, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable . . . ." The *discretionary* authority whether to decrease rates on an interim basis conforms to the legislative concern that both legitimate business concerns and the public interest be served.[10]

Finally, we cannot ignore the statutory scheme pursuant to which an interim rate decrease is, as the term suggests, temporary. An interim rate decrease hearing is to be followed by a full rate determination hearing.[11] The fact that an interim rate hearing results in only temporary ratemaking until more information is available at a subsequent full rate case hearing indicates that the legislature vested the department with discretion to determine whether an interim rate adjustment was necessary at all. The mandatory surcharge to be levied against ratepayers if the department later determines the interim rate decrease to have been excessive is further evidence of the discretion afforded the department because the department must temper its decision with the consideration of the potential future impact on ratepayers of a temporary rate decrease.

These factors lead to the conclusion that the interim rate decrease authority is discretionary. That determination disposes of the plaintiff's claims, because those claims rest upon the implicit premise that an interim rate decrease is mandatory when a utility is overearning.

---

[10] See footnote 9 of this opinion.

[11] As we noted earlier, the full rate case in this instance was completed by February 5, 1999, less than one year after the conclusion of the interim rate case hearing.

## III

Each of the plaintiff's three specific claims implicitly presupposes that an interim rate reduction is mandatory when there are overearnings by a utility. Our conclusion that such rate reductions are, in fact, discretionary on an interim basis fatally undermines the plaintiff's position. Even if our conclusion were otherwise, however, we would reject the plaintiff's arguments.

### A

The plaintiff claims that the trial court improperly concluded that accelerating the amortization of regulatory assets directly benefits ratepayers under § 16-19 (g). As we understand it, the plaintiff's argument is that the trial court improperly affirmed the decision of the department on the basis of a factual determination that the department did not make and that is not supported by the evidence in the record—namely, that the accelerated amortization directly benefits ratepayers under § 16-19 (g).[12] We disagree with the plaintiff, because any such finding by the trial court, even if improper, was unnecessary and not dispositive.

Section 16-19 (g) requires that "the *company* . . . demonstrate to the satisfaction of the department that earning such a return on equity or collecting rates which are more than just, reasonable and adequate is directly beneficial to its customers. . . ." (Emphasis added.)

The plaintiff's argument that the trial court improperly discerned a direct benefit to ratepayers miscon-

---

[12] The plaintiff's argument alleged a violation by the trial court of General Statutes § 4-183 (j), pursuant to which that court must affirm an agency decision on a factual question if that decision is supported by substantial evidence in the record, rather than substitute its own judgment as to the weight of the evidence. Specifically, the plaintiff claims that the trial court substituted its judgment for that of the department as to the weight of the evidence on the factual determination of whether the accelerated amortization directly benefited ratepayers. We believe our rephrasing to be a clearer and more accurate restatement of the plaintiff's claim.

strues the statute. The department is not required to justify its action pursuant to § 16-19 (g) as a direct benefit to ratepayers. The "direct benefit" language refers to the utility's justification for retaining overearnings, not to the department's discretionary authority to order a rate decrease. Moreover, the plaintiff's contention that accelerated amortization must directly benefit ratepayers incorrectly presupposes that the amortization of regulatory assets is not a rate decrease.

Even if we assume that it were necessary to prove that the amortization was directly beneficial to ratepayers, it appears that the amortization does benefit ratepayers by reducing future liabilities as discussed in part III B of this opinion.

## B

The plaintiff next claims that the trial court improperly determined as a matter of law that the asset amortizations are actually rate reductions. The plaintiff asserts that the trial court improperly permitted the department to adjust overearnings by writing down the power company's regulatory assets while allowing it to maintain the same cash flow position. The department and the power company, on the other hand, contend that rate reduction is not synonymous with and does not require reduced cash flow. We agree with the department and the power company.

The accelerated amortization of regulatory assets is a real and tangible rate reduction, albeit less apparent and immediate than a cash rate reduction. A regulatory asset is a liability of a utility's ratepayers. Utility companies may incur large expenses in various ways—storm damages, installation of new facilities, increased taxes and so forth. These expenses, if passed immediately on to ratepayers, could create havoc. An immediate recovery of such expenses could cause sudden upward increases in rates, commonly termed "rate shock." In

order to avoid rate shock, commissions often will permit utility companies to recover their expenses from ratepayers on a deferred basis, listing the ratepayers' debt as a "regulatory asset." A regulatory asset is, therefore, a future debt of the ratepayers that can be passed on, together with interest, to the ratepayers. Accelerated amortization of a regulatory asset by the power company, therefore, necessarily reduces the future liability of its ratepayers. See L. Hyman, America's Electric Utilities: Past, Present and Future (5th Ed. 1994) p. 243; National Conference of State Legislators, The States & Utility Regulation: Electric, Natural Gas, & Telecommunications: Collected Papers (1985).

For the plaintiff to maintain that there is no rate reduction in this instance is misleading. Certainly, there is no immediate cash rate reduction. Ratepayers continue to pay the same rate. Future rates, however, necessarily will be lower because of the write down of the regulatory assets that would constitute future liabilities.

## C

The plaintiff finally claims that the trial court improperly determined as a matter of law that § 16-19 (g) does not require a cash rate reduction when the department fails to find a direct benefit to ratepayers. In other words, the plaintiff reads the statute to mandate an immediate cash rate reduction unless the department finds a direct benefit to ratepayers. We disagree.

There is no language in the statute to support this interpretation. Section 16-19 (g) simply provides that the department "*may* order an interim rate decrease . . . ." (Emphasis added.) Nothing in the text of the statute mandates that a decrease must be a cash reduction; or, as the trial court stated, nothing in the statute precludes a noncash rate adjustment. As discussed earlier, a noncash reduction can be a real and meaningful rate decrease.

Moreover, contrary to the plaintiff's assertion, the legislative history of § 16-19 does not support its position. The plaintiff essentially argues that because § 16-19 (d), the interim rate increase statute, allows cash rate increases to utilities, the legislature intended § 16-19 (g) to provide analogous relief to ratepayers and that, therefore, the legislators intended § 16-19 (g) to provide only cash rate decreases. The legislative history of § 16-19 (g), however, indicates only that the legislature, recognizing the existence of a mechanism whereby utilities could petition for and obtain an interim rate increase, sought to provide a mechanism whereby the department could order an interim rate decrease to benefit ratepayers. The legislative history provides no support for the further conclusion that such a decrease must be a cash reduction.

The judgment is affirmed.

In this opinion the other justices concurred.